NUMBER 13-00-00054-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI

___________________________________________________________________


JAMES ANTHONY WAYNE , Appellant,


v.


DAVID M. HYBNER , Appellee.

___________________________________________________________________

On appeal from the County Court at Law No. 2

of Victoria County, Texas.

__________________________________________________________________


O P I N I O N

Before Justices Hinojosa, Yañez, and Castillo

Opinion by Justice Castillo



This case arises from a landlord-tenant dispute involving separate commercial leases of a building (hereinafter the "Valley
Gold building") and an adjacent garage. A jury answered issues in favor of the tenant, appellee David M. Hybner, and
against the landlord, appellant James Wayne. The district court entered a take-nothing judgment against appellant Wayne
and awarded $12,500.00 attorney's fees in favor of Hybner on his declaratory judgment counterclaim. On appeal, Wayne
raises four issues for review: (1) whether the trial court erred in awarding attorney's fees to Hybner; (2) whether the
evidence was legally and factually sufficient to support attorney's fees; (3) whether the trial court should have excused a
venireman for cause; and (4) whether the evidence was sufficient to support the jury's finding regarding Hybner's
compliance with the lease agreement. By cross-appeal, in a single issue, Hybner maintains that the trial court erred in
dismissing his declaratory judgment action regarding the Valley Gold building lease. We reverse in part and affirm in part. 


Background

The case essentially involves four disputes: the lease agreements for the Valley Gold building, (1)

 the lease agreements for the garage, (2) Wayne's claim for conversion of furniture, and Hybner's counter-claim for
declaratory judgment. By his counterclaim, Hybner sought a determination of the parties' relative rights under the lease
agreements and payment of attorney's fees.

Beginning in 1986, the parties entered into their first commercial lease agreement involving the Valley Gold building and
in 1994 for a small garage located on the property. When Hybner vacated the premises on December 31, 1996, Wayne
complained that he failed to surrender the premises in the condition required by the lease agreements. Wayne expected
Hybner to surrender the Valley Gold building in the same condition it had been in 1986 and the garage in the same
condition it had been in 1994. Wayne also complained that Hybner converted furniture which was in the Valley Gold
building when Hybner first assumed possession. 

 Wayne sued in contract for breach of the lease agreements and in tort for conversion of the furniture. Hybner filed a
counterclaim under the Declaratory Judgment Act, seeking interpretation of certain provisions in the lease agreements and
attorney's fees. (3) After hearing competing motions for summary judgment, the trial court dismissed Hybner's counterclaim
pertaining to the Valley Gold building, finding that it was improperly brought since the issue was pending when the
counterclaim was filed. In the same order, the trial court did not dismiss the counterclaim referring to the garage leases and
expressly reserved it for further order. The trial court interpreted certain provisions in the Valley Gold building leases and
fixed the date for assessment of the building's condition as January 1 of each year. (4)

At trial, Wayne's complaints addressed the condition of the main building, the condition of the garage, and the taking of
furniture he owned. Wayne introduced and followed a punch list, addressing his complaints that Hybner failed to timely
repair, clean up, and maintain the property and his complaint that Hybner failed to surrender the premises in the good
condition existing when Hybner assumed possession. (5)

The jury answered all issues favorably to Hybner and determined that $12,500.00 was a reasonable fee for the necessary
services of Hybner's attorney. The Leases

To operate an auto-body shop, Hybner leased the Valley Gold building over a ten year period beginning in 1986. Each
year, he renewed and renegotiated a lease for the following year. Recognizing that he was paying over $30,000.00 annually
in rent, Hybner decided to buy a building and found one. He timely advised Wayne of his intent and vacated the premises
on December 1, 1996. 

At the time of trial, Wayne was the sole shareholder for Valley Gold, Inc., which for many years was centralized in the
building leased to Hybner. After the family business closed, the building underwent extensive renovations for a car
dealership that did not materialize. Thereafter, the building was occupied by Gary Martin, who left the property in good
condition. (6)

 Hybner rented the building until December 31, 1996, when he surrendered possession of all leased property. (7)

Wayne's complaints regarding the condition of the premises upon its surrender were numerous. (8) By the time of trial, he
had paid approximately $12,000.00 for repairs and expected to pay over $13,000.00 to paint the building. Wayne's expert,
Harvey Knezek, an estimator, testified that because the building had not been maintained or repaired, the reasonable and
necessary cost to put the property in a leasable condition was $47,231.36. (9)

 At the time of trial, the Valley Gold building was fully leased to three different tenants although, according to Wayne, at a
loss of $625.00 per month because of its condition.

At trial, Hybner testified that each lease was a one-year lease, and at the end of each year he would negotiate a new lease. 
In 1994, he signed a one-year lease at $135.00 per month for the garage at the rear of the premises. (10)

 Although he did not need the building, he leased it to rid the property of the junked cars belonging to the tenants in
possession at the time. (11) 

After locating a building to buy, Hybner decided not to enter into new leases for 1997. He understood the lease
arrangement was "a new lease for a new year," and so he believed he was to leave the premises in the condition existing on
January 1, 1996. Regarding the allegations against him, Hybner stated, "I left the building, I promise you, I left that
building in a better state than I got it by far." He added that, to his knowledge, Wayne spent nothing on the building
throughout the time Hybner occupied it, whereas he spent money "fixing it up." 

Procedural History

Wayne filed his original petition alleging breach of his "lease agreements" and conversion of personal property. In an
amended answer, Hybner included a counterclaim for declaratory judgment and attorney's fees. In it, he urged that the
purpose of the action was "to determine the relative rights of the parties to two lease agreements, each dated January 1,
1996." Hybner attached a copy of the Valley Gold building lease and the garage lease, both executed on January 10, 1996. 

Wayne filed his first amended original petition expanding his conversion claim. Hybner subsequently filed a motion for
summary judgment seeking a declaration that his obligation to maintain the premises only required him to maintain them in
the condition that existed on January 1, 1996, and that "the rights and obligations of the parties to each lease agreement
since 1986 were to be determined without reference to any prior lease and only with reference to the conditions that existed
as of the date of the beginning and end of each lease period." As evidence, Hybner attached his affidavit and the two 1996
lease agreements pertaining to the Valley Gold building and to the garage. 

Together with his response to the motion, Wayne filed his own motion for partial summary judgment. He sought a
declaration from the trial court that (1) Hybner's obligations regarding maintenance of the premises began on December 2,
1986 and (2) Hybner had no legal basis for seeking declaratory judgment or attorney's fees since the counterclaim merely
sought resolution of disputes already pending. (12) 

In his ruling on the motion for partial summary judgment, the trial judge entered an order dismissing Hybner's counterclaim
regarding the Valley Gold building, finding that such issues were already before the court when the counterclaim was filed. 
The court did not dismiss the counterclaim regarding the garage, reserving it for "further order." The trial court found that
(1) the various lease agreements "are not renewals or extensions of prior leases;" (2) the effective date of the 1996 lease
agreements was January 1, 1996; and (3) the lease provision contained in the Valley Gold lease addressing alterations,
improvements and maintenance was an "on-going requirement which was owed on December 31, 1996 the same as earlier
dates . . . ." 

After a four-day trial, issues were submitted to the jury regarding the Valley Gold building, the garage, conversion and
attorney's fees. With jury answers favorable to Hybner, the trial court entered a final take-nothing judgment against Wayne
and an attorney's fees judgment in favor of Hybner. After post-trial proceedings, both parties timely filed their appeals. 



Discussion

Attorney's Fees

In his first issue, Wayne maintains that the trial court erred in granting the attorney's fees judgment. In his second issue,
Wayne challenges the legal and factual sufficiency of the evidence to support the judgment for attorney's fees. The issues
are considered seriatim.

Wayne urges that the declaratory judgment counterclaim did not allege a cause of action independent of his claims. (13) He
adds that the counterclaim was filed solely for attorney's fees, was merely defensive to Wayne's claim for damages and,
therefore, was impermissibly filed. 

Wayne essentially asks us to revisit the trial court's order refusing to dismiss a declaratory action counterclaim in its order
on the partial summary judgment. In a traditional summary judgment proceeding, the appellate standard of review is
whether the successful movant at the trial level carried the burden of showing that there is no genuine issue of material fact
and that judgment should be granted as a matter of law. Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985). 

A declaratory judgment action is "merely a procedural device for deciding cases already within a court's jurisdiction." State
v. Morales, 869 S.W.2d 941, 947 (Tex. 1994). The stated purpose of the Declaratory Judgments Act is "to settle and afford
relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem. Code
Ann. § 37.002(b) (Vernon 1997). The statute expressly provides that it is "remedial" and "is to be liberally construed." Id. 
A declaratory judgment is appropriate only if a justiciable controversy exists as to the rights and status of the parties and the
controversy will be resolved by the declaration sought. Bonham State Bank v. Beadle, 907 S.W.2d 465, 467 (Tex.
1995)(citing Texas Ass'n of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 446 (Tex.1993)). "To constitute a justiciable
controversy, there must exist a real and substantial controversy involving genuine conflict of tangible interests and not
merely a theoretical dispute." Id. (quoting Bexar-Medina-Atascosa County Water Control & Improvement Dist. No. 1 v.
Medina Lake Protect. Ass'n, 640 S.W.2d 778, 779-80 (Tex. App. - San Antonio 1982, writ ref'd n.r.e.)). 

A trial court has discretion to enter a declaratory judgment so long as it will serve a useful purpose or will terminate the
controversy between the parties. Id. at 468. However, the Declaratory Judgment Act is not available to settle disputes
already pending before the court. BHP Petroleum Co. v. Millard, 800 S.W.2d 838, 841 (Tex. 1990); Staff Indus., Inc., v.
Hallmark Contracting, Inc., 846 S.W.2d 542, 547-48 (Tex. App. - Corpus Christi 1993, no writ) (holding that the trial
court erred in allowing a declaratory judgment counterclaim that presented no issues beyond those raised in the original
suit). A counterclaim based on the Declaratory Judgment Act must state a claim for affirmative relief. BHP Petroleum,
800 S.W.2d at 841, n.8. A claim for affirmative relief is stated if the counterclaim alleges a cause of action independent of
the plaintiff's claim, on which the defendant could recover, even if the plaintiff were to abandon or fail to establish his
cause of action. Id. at 841. Consequently, a defensive declaratory judgment counterclaim may not be a mere denial of the
plaintiff's cause of action but must present issues beyond those raised by the plaintiff or have greater ramifications than the
original suit. Id. at 842; Staff Indus., Inc., 846 S.W.2d at 547-48. A counterclaim that presents no new controversy but
exists solely to pave the way for an award of attorney's fees is improper. Hitchcock Prop. Inc. v. Levering, 776 S.W.2d
236, 239 (Tex. App. - Houston [1st Dist.] 1989, writ denied). 

In his motion for partial summary judgment, Wayne sought to strike Hybner's counterclaim in its entirety. The trial court
dismissed Hybner's counterclaim seeking a declaratory judgment regarding the parties' rights under the Valley Gold leases
and left Wayne's counterclaim regarding the garage leases pending. Wayne's complaints about the garage included broken
windows, a broken door and frame, broken light fixtures, and deterioration of custom doors. (14)

Wayne urges that the trial court should have also dismissed the counterclaim seeking a declaratory judgment regarding the
parties' rights under the garage leases because it did not assert any independent right or ground of recovery. Hybner
counters that Wayne's original petition refers to several yearly leases of the Valley Gold building beginning in 1986 and
ending in 1996 and that the petition fails to mention the garage lease. Hybner's counterclaim sought a determination of the
parties' relative rights "to two lease agreements, each dated January 1, 1996." (emphasis supplied). (15) Wayne admits that
his petition did not specifically mention the garage but urges that it generally alleged violation of "lease agreements." 

In order to determine whether the counterclaim alleged a cause of action independent of the claims before the court, we
address first the adequacy of the petition to give notice sufficient to encompass the garage leases. 

The record shows that Hybner did not file special exceptions with regard to the original or amended petitions alleging
breach of contract and conversion. In the absence of special exceptions, we must construe a pleading in favor of the
pleading party. Roark v. Allen, 633 S.W.2d 804, 809 (Tex. 1982);Torch Operating Co. v. Bartell, 865 S.W.2d 552, 554
(Tex. App. - Corpus Christi 1993, writ denied). A pleading is sufficient if it gives fair and adequate notice to the opponent. 
Roark, 633 S.W.2d. at 810. Technical rules of pleading cannot defeat a right substantially alleged. Barnes v. Patrick, 105
Tex. 146, 146 S.W. 154, 155 (1912). "Every fact will be supplied that can reasonably be inferred from what is specifically
stated." Torch Operating Co., 865 S.W.2d at 554 (quoting Gonzalez v. City of Harlingen, 814 S.W.2d 109, 112 (Tex. App.
- Corpus Christi 1991, writ denied)).

In paragraph 6 of the original petition, Wayne presented the following allegation: (16)

Defendant breached these express written agreements. Defendant failed to repair, clean-up and maintain the leased
property. Defendant's failure to timely repair, clean-up or maintain the property is a breach of contract. Defendant failed
to return the property to the landlord in the condition required by his agreement and/or by law. Defendant failed to
surrender the property in as good condition as that in which it was at the commencement of his possession, "ordinary wear
and tear excepted." 

(Emphasis added). The first sentence addresses the Valley Gold building lease provisions Wayne included in the preceding
paragraphs of his pleading. The last sentence, however, refers to the garage leases. In each garage lease before the trial
court and in the record on appeal, the following provisions appear:

SECURITY DEPOSIT: . . . Deductions from the security deposit may be made for any damage done to the property during
the term of this lease, reasonable wear and tear excepted.

REPAIRS: Lessee accepts the premises in their present condition and agrees they are suitable for the purposes for which
leased. Lessor agrees to repair at his expense the roof, foundation and exterior walls only, excluding all windows and
doors, upon the receipt of written notice from Lessee requesting repairs. Lessee shall take good care and maintain at his
expense the remainder of property, and upon the termination of this lease deliver the property in good repair and condition,
reasonable wear and tear and damage by fire excepted. 

(Emphasis added). The phrase "wear and tear excepted" is absent from the Valley Gold leases. (17)

The record demonstrates that the petition substantially alleged breach of both the Valley Gold building and garage leases. 
The record establishes that, prior to his filing a counterclaim seeking declaratory judgment, Hybner had fair and adequate
notice that Wayne's breach of contract action encompassed both the Valley Gold building and the garage leases. The
counterclaim as to the garage lease presented a theoretical dispute, defensive to the claims already before the court. (18) The
record establishes that such counterclaim presented no new controversy and, therefore, was improperly brought.
Accordingly, the counterclaim regarding the garage leases should have also been dismissed. 

At the summary judgment stage, the trial court had sufficient evidence before it to find that there was no genuine issue of
material fact and that the counterclaim addressing the garage leases was an improper declaratory judgment counterclaim. 
Because the trial court did not dismiss the counterclaim regarding the garage leases and allowed the matter to proceed to
trial, we find error. Wayne's first issue is sustained. 

In a declaratory judgment action, the court may award reasonable and necessary attorney's fees. Tex. Civ. Prac. & Rem.
Code Ann. §37.009 (Vernon 1997). In the present case, the attorney's fees judgment was based upon the pending
counterclaim for declaratory judgment regarding the garage lease. Since the attorney's fees award and judgment stems from
a counterclaim improperly brought, we reverse and vacate the trial court judgment to the extent that it awards attorney's
fees. Accordingly, we need not reach appellant's second issue challenging the legal and factual insufficiency of the
attorney's fees award. See Tex. R. App. P. 47.1.

Juror Disqualification

In his third issue, appellant contends that the trial court erred in failing to dismiss Juror No. 10, Paul Clyde Lundgren, for
cause. He urges that prospective juror Lundgren demonstrated during voir dire that he was a fact witness and biased in
favor of Hybner. Essentially, Wayne argues that by not granting his challenge for cause as to juror Lundgren, the trial
court erroneously permitted another objectionable prospective juror, Maria D. Gonzalez, to serve. He complains that juror
Gonzalez did serve on the jury and did vote against Wayne in the case. There was no challenge for cause as to juror
Gonzalez. We find that appellant failed to preserve error for review.

In order to preserve error for appellate review in the denial of a challenge for cause, an appellant must: (1) advise the trial
court; (2) before exercising his peremptory challenges; (3) that the court's denial of the challenge for cause would force the
party to exhaust his peremptory challenges; and (4) that, after exercising these peremptory challenges, a specific
objectionable juror will remain on the panel. Goode v. Shoukfeh, 943 S.W.2d 441, 452 (Tex. 1997); Hallet v. Houston
Northwest Med. Ctr., 689 S.W.2d 888, 890 (Tex. 1985). 

At the end of voir dire and individual questioning of juror Lundgren, appellant's counsel urged a challenge for cause on the
basis of bias and personal knowledge which would make the juror a witness. (19) Juror Lundgren had known Hybner about
eleven years and had visited the Valley Gold building on occasion since they both had an interest in classic cars. The trial
court denied the challenge for cause. The record shows that the clerk then gave the attorneys the jury list to exercise their
strikes, the attorneys peremptorily struck the names of jurors, and handed the list back to the court. Subsequently,
appellant's counsel re-urged his challenge for cause as to juror Lundgren, stating, "I would have exercised a peremptory
strike to strike juror number eight, Maria D. Gonzalez, but instead was required to strike Paul Clyde Lundgren for cause." 
Following, appellant's counsel added, "I would move that the court reconsider its ruling on the for cause issue, strike Paul
Clyde Lundgren and allow us to exercise a strike against Maria D. Gonzalez." The trial court denied the challenge. After
reviewing the record of the testimony during voir dire, we are compelled to conclude that appellant has failed to preserve
error. Appellant has failed to show that prior to exercising his peremptory challenges, he advised the court that its denial of
the challenge for cause would force the him to exhaust his peremptory challenges and that, after exercising those
peremptory challenges, a specific objectionable juror would remain on the panel. Goode, 943 S.W.2d at 452 (Tex. 1997);
Hallet, 689 S.W.2d at 890. In this case, appellant did not notify the court that he would be utilizing a peremptory challenge
on Lundgren, and that he would then be forced to take an objectionable juror, until after he had turned in his list of
peremptory challenges. When a party delivers its list of peremptory strikes to the court, it has "exercised its peremptory
challenges." Ortiz v. Ford Motor Credit Co., 859 S.W.2d 73, 75 (Tex. App. - Corpus Christi 1993, writ denied); Lopez v. S.
Pacific Transp. Co., 847 S.W.2d 330, 333 (Tex. App. - El Paso 1993, no writ); Beavers v. Northrop Worldwide Aircraft
Serv., Inc., 821 S.W.2d 669, 681 (Tex. App. - Amarillo 1991, writ denied). Indeed it is the appellant's burden to prove that
he followed the Hallet steps prior to exercising his peremptory strikes and where the record does not reveal that the Hallet
notice was timely given, no error is preserved for review. Brown v. Pittsburg Corning Co., 909 S.W.2d 101, 104 (Tex.
App. - Houston [14th] 1995, writ denied). In the present case, it is clear that appellant gave his Hallet notice after
exercising his peremptory challenges. He has therefore not preserved error on this issue. Goode, 943 S.W.2d at 452;
Hallet, 689 S.W.2d at 890. Wayne's third issue is overruled. (20)



Sufficiency of the evidence

In his fourth issue, Wayne asserts that the jury's failure to find that Hybner failed to comply with the Valley Gold lease
agreement was so against the great weight and preponderance of the evidence as to result in an unjust verdict. Hybner
counters that there is no evidence upon which the jury could have found otherwise since the 

evidence he adduced at trial showed that he surrendered the property in as good as or better condition than before he
entered the leases. The issue as submitted to the jury involved maintenance of the Valley Gold building during the lease
period and alterations to the building. 

When a party attacks the factual sufficiency of an adverse finding on an issue on which he bears the burden of proof, he
must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. Dow
Chem. Co. v. Francis, 46 S.W.3d 237, 242 (Tex. 2001) (citingCoucher v. Coucher, 660 S.W.2d 55, 58 (Tex. 1983)). We
must consider and weigh all of the evidence, and we can set aside the verdict only if the evidence is so weak or if the
finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. Id.; Allied Fin.
Co. v. Garza, 626 S.W.2d 120, 125 (Tex. App.- Corpus Christi 1981, writ ref'd n.r.e.) (in reviewing "factually insufficient
evidence" points, we consider all of the evidence).

Wayne complains about the jury's response to Jury Question 1, which reads: (21)

Regarding the Valley Gold building, 1105 E. Rio Grande, Victoria, Texas,

did David Hybner fail to comply with any of the following obligations?



David Hybner was required to maintain the building and improvements

located upon the premises, including driveways and grounds, in a

reasonably good state of repair and with a clean and neat appearance and

with the driveways clear of any weeds or growing grass that might be

injurious to the asphalt or concrete base of such driveways. David 

Hybner agreed that no alterations, of any kind whatsoever, would be

made to the leased premises unless David Hybner had approval by James

Wayne for any alterations or improvements to be made.



INSTRUCTION: You are instructed that these are obligations which

were required of David Hybner in each lease agreement signed by

David Hybner, and were on-going requirements which were owed by 

David Hybner on December 31, 1996 the same as on earlier dates.



Answer "yes" or "no."



The jury answered, "No." 



In support of this issue on appeal, Wayne specifically points to Hybner's admissions at trial that: (1) the stopped-up drains
were not in a good state of repair; (2) graffiti remained on the building walls; (3) the paint on the interior walls was "not a
clean and neat appearance;" (4) it was his responsibility to remove signs but did not; and, (5) he did not clean all four
restrooms. 

As Wayne points out, Hybner admitted at trial that the drains were not in a good state of repair when he vacated the Valley
Gold building. However, testifying on behalf of Hybner, Larry Arnold said he had helped clean the drains when Hybner
first assumed possession of the premises and helped clean the building riddled with debris. He added that after moving the
large debris out of the way, they swept. Arnold testified that, while they cleaned the floor with water, all the drains backed
up. They used squeegees to push the water out of the building. The evidence before the jury, then, was that the drains
were not in a good state of repair when Hybner both assumed and surrendered possession of the Valley Gold building.

As Wayne correctly notes, Hybner admitted that the exterior walls of the building had graffitti on them when his lease
ended. Hybner also admitted that there were items when he left the property that were not in a reasonably good state of
repair or a neat appearance. Immediately after these admissions, appellee's counsel questioned him regarding the
following lease provision admitted in evidence:

In connection with this obligation of David Hybner it is agreed that if such obligations are not performed by David Hybner
within ten days after written notice to David Hybner from James Wayne, then David Hybner appoints James Wayne as his
agent for securing performance of said obligations and any cost incurred of said obligations and any cost incurred by James
Wayne shall be due as part of the following months rental.

Hybner admitted that, on January 16, 1997, he received Wayne's letter regarding Hyber's failure to make the complained-of
repairs. The letter allowed Hybner ten days of the date of the letter to make the repairs in Wayne's punch list, which was
faxed to Wayne on December 20, 1996. A review of the punch list containing the complained-of problems with the
premises compiled after the December 19, 1996 inspection of the premises shows the entry "Remove graffiti from east
wall." (22) Wayne's written notice was moot. The lease was terminated, and so the demand was untimely. According to the
lease provision, Wayne's remedy for Hybner's failure to clean the graffiti and leave the premises in a neat and clean
appearance was to add the costs for the repair and clean up to the following month's rent. Since the lease terminated,
Hybner owed no rent. (23) The written notice was ineffectual as to the remaining complaints as well. As Wayne specifically
points out in the record, Hybner admitted he had painted a sign showing "ALM Coach Works" on the wall and that
somebody leasing the property would not want that sign on the wall. Hybner countered that, when he assumed possession
of the property, a sign showing "Martin Auto Body" was there and he painted his sign over it. Hybner also admitted that
paint on the walls of other rooms was "not a clean and neat appearance." As Wayne notes, Hybner admitted that he did
not remove the signs on the windows and agreed it was his responsibility. As Wayne correctly notes, Hybner admitted he
did not clean all the bathrooms when he surrendered the building. He further admitted that since he also did not remove all
the cobwebs, his cleanup of the bathrooms was not thorough. Hybner also admitted that he did not go in with cleaners or
have someone go in with cleaners and clean a bathroom. Hybner countered that he left the bathroom "a whole lot cleaner"
than it was when he assumed possession of the premises. 

The complained-of admissions on appeal refer to minor problems with the building. Even though Hybner admitted to these
complained-of minor items, Wayne did not comply with the notice provision of the lease regarding repairs during the lease
term. At trial, Hybner testified that throughout the ten years he leased the building, Wayne spent no money toward its
maintenance or repair. Hybner did. Wayne did not dispute this fact. 

As the sole trier of fact, the jury was free to draw its conclusions from the evidence before it. At trial, Hybner testified that
in late 1985, he became interested in the Valley Gold building since he owned a body shop business and the building had a
body shop sign on it. Because it contained a paint booth, which he needed, he agreed to rent the part of the building in
which it stood. (24) Upon viewing the interior of the building, Hybner noticed it was in "pretty sad shape." There were car
parts and "paint all over the floors" but he understood, since it was a body shop. Where a freezer had been bolted to the
floor, Hybner patched up the holes in the concrete. Equipment and furniture remained in the rest of the building. On the
next lease, Hybner leased two-thirds of the building and by 1989 he occupied the entire building. 

Although the garage was in the rear of the premises and a vacant lot was adjacent to the Valley Gold building, Hybner
believed his leases did not include them. (25) When Wayne complained to him that he was not keeping the vacant lot clean,
Hybner used a tractor and a shredder to clean it up. Initially, the lot contained concrete, "a mound of junk," and overgrown
weeds and grass, which Hybner managed to eventually clean out to reveal a "pretty gravel parking lot" underneath, although
the weeds and grass grew anew. Hybner admitted that in 1995, he did pile old asphalt from a friend's paving business on
the lot but he ultimately removed it. 

At trial, Hybner called two other witnesses. Daniel Golden, the owner of Horvath Electric Service, testified that he had
been in business next door to the Valley Gold building for about 33 years and occasionally visited Hybner. Although he
"never did go in the building until [Hybner] moved in," he testified that when Hybner vacated the building, he left it "much
cleaner" and "in reasonable condition." Regarding the vacant lot, Hybner dumped some gravel on it one time but removed it
and smoothed out the lot. Golden stated that the broken bricks on the exterior of the building had been in that condition for
eight to ten years. Golden had at one time rented the smaller building on the premises from Wayne and, in his opinion, it
looked "just like it always did" when Hybner left.

Hybner's friend, Larry Arnold, testified that he helped Hybner move in when he first leased the Valley Gold building. He
saw car parts, paper trash, and paint cans scattered throughout the building, as though someone "walked out the day before
in the middle of working there." The drains were stopped up, lights and electrical circuits did not work, (26)

 and the pipes leaked. (27) He explained that in painting cars, the overspray" is in the air and settles out. It sticks to
everything, floors, walls, tools, equipment." 

After reviewing all the evidence, we conclude that the jury finding was not so contrary to the great weight and
preponderance of the evidence as to be clearly wrong and unjust. The evidence in the record is sufficient to support a
finding that Hybner maintained the Valley Gold building in a reasonably good state of repair and with a clean and neat
appearance. Appellant's fourth issue is overruled. 

Hybner's Appellate Claim

By a single issue in his appeal of this cause, Hybner maintains that the trial court erred in dismissing his declaratory
judgment action regarding the Valley Gold building lease and claim for attorney's fees for prosecuting that declaratory
judgment action. Essentially, Hybner asks us to review the trial court's granting partial summary judgment in favor of
Wayne, dismissing his counterclaim regarding the Valley Gold building leases. 

Hybner contends that his declaratory judgment action sought an interpretation of an entirely different lease that involved a
dispute between the parties. Hybner maintains that he brought a valid counterclaim since it sought a declaration of the
rights of the parties as to a dispute over a written instrument. 

We have found that Wayne's pleadings sufficiently raised a breach of contract action relating to both the Valley Gold
building and the garage leases. At the trial court level, Hybner did not dispute that the original petition encompassed the
Valley Gold building leases. In its order granting partial summary judgment, the trial court found that, to the extent that
Hybner's counterclaim sought a declaration regarding one Valley Gold lease agreement, the issues were already before the
court when the counterclaim was filed. Hybner's counterclaim did not state a cause of action independent of the plaintiff's
claim on which he could recover. BHP Petroleum Co., 800 S.W.2d at 841. The counterclaim was improperly brought. 
We overrule Hybner's sole issue.

Conclusion

Having granted appellant's first issue, and overruled all other issues before us, we modify the trial court's judgment to
exclude the award of attorneys' fees to appellee and, as modified, affirm the judgment of the trial court.

ERRLINDA CASTILLO

Justice



Do not publish.

Tex. R. App. P. 47.3.



Opinion delivered and filed

this 31st day of August, 2001.

1. Owned by James Wayne, the building was a galvanized metal building which measured approximately 15,000 square
feet and had in the past housed the Valley Gold, Inc. milk and ice cream company. It was bordered by a vacant lot which
was previously the company parking lot. 

2. Measuring approximately 1,200 square feet, the garage was located in the rear of the Valley Gold property. 

3. Tex. Civ. Prac. & Rem. Code Ann. §37.009 (Vernon 1997). By his counterclaim, Hybner sought to determine the
parties' relative rights under the lease agreements dated January 1, 1996.

4. As a result, the trial court also found that "some lease agreements are barred by the statute of limitations." 

5. The punch list and the eleven lease agreements involving the Valley Gold building were admitted in evidence. The
1988 lease reflects unexplained hand-written changes on all dates making it appear to be a 1989 lease, although a 1989
lease was admitted. The 1996 garage lease was also admitted in evidence.

6. Called as Wayne's rebuttal witness, Mr. Martin's widow testified to the condition of the premises upon surrender.

7. Hybner accompanied Wayne on a walk-through inspection of the building on December 19, 1996. At trial, Hybner
introduced a six-page "punch list" containing items he asked Wayne to repair or clean up prior to December 31, 1996, the
day of the final inspection. Wayne did not appear for the final inspection. 

8. As presented to the jury, Wayne's complaints regarding the condition of the Valley Gold premises traced a prepared
punch list and included the following: (1) the restrooms were filthy; (2) exterior bricks were broken; (3) weeds were
overgrown and timber was missing in an exterior planter; (4) a rusted steel column needed painting; (5) asphalt
contaminated the gravel parking lot; (6) asphalt spoil was not hauled off the parking lot; (7) a pile of junk concrete was not
hauled off the property; (8) graffiti remained on the exterior wall; (9) a down spout was damaged; (10) overgrown grass,
weeds and trees damaged the asphalt and concrete; (11) a fence was damaged; (12) mildew was left on the building; (13)
screens were missing or damaged; (14) doors and louvers needed painting; (15) paint was spilt or oversprayed on the floor;
(16) sprinkler heads inside the building were taped over; (17) filters in the paint booth were not replaced; (18) windows
were broken and dirty; (19) shelving in the boiler room was removed and damaged the wall tile; (20) a plywood wall was
installed without authorization; (21) a mop sink was dirty; (22) tape was not removed from walls; (23) boards were not
removed; (24) bolts imbedded on the floor were not removed, cut or rounded off; (25) signs were not removed; (26) car
paint on the paint room walls was not scraped off; (27) electrical fixtures did not work; (28) light bulbs were missing or not
working; (29) light covers were missing; (30) an electrical control box was removed leaving cut electrical wires exposed;
(31) electrical molding was loose; (32) circuit breakers were removed; (33) air lines were cut by an acetylene torch,
damaging walls and pipes; (34) a water heater leaked; (35) a manhole and the majority of about forty drains were backed
up; (36) drain covers needed to be replaced; (37) paint was peeling off the walls; (38) a shower head was missing; (39)
toilet seats were broken; (40) a lavatory sink was leaking; (41) an air dryer was removed; (42) bullet proof Lexann
windows in the rear of the building were oversprayed with paint; (43) handles on expensive windows were broken since
they were not lubricated or oiled; (44) the front door was binding; (45) nails in the walls were not removed; (46) expensive
stained doors were damaged; and (47) 1,764 square feet of tile needed replacing. Wayne's complaints before the jury
regarding the garage included: (1) broken windows; (2) missing hinges and locks on the doors; (3) a broken door and
frame; (4) deterioration of custom doors; (5) missing light covers; and (6) broken light fixtures.

9. Knezek based his opinion on a visit to the premises on March 6, 1998, approximately fifteen months after Hybner
vacated it. Wayne testified that he was suing Hybner for $45,325.44 for repairs and $3,000.00 for conversion of office
furniture. 

10. With broken windows and doors easy to kick in, Hybner determined the garage was not a secure building. Wayne
stored his wrecked car there for about two years and eventually gave Hybner title to it in lieu of reducing the rental rate on
the garage.

11. Hybner surmised the tenants were using drugs and thought it better for his business that they not be on the premises.

12. Wayne attached his affidavit and all leases pertaining to the Valley Gold building and the garage as well as the punch
list containing complained-of problems with the premises. Hybner filed a general response urging that questions of fact
existed regarding the conditions of the leased premises, compliance with the lease agreements, and conversion.

13. Wayne urged the argument below in his motion for summary judgment.

14. See footnote number eight supra.

15. Hybner attached certified copies of two lease agreements each dated January 10, 1996. One lease pertained to the
Valley Gold building and the other to the garage. The only reference to prior leases was in Hybner's affidavit which stated,
"Prior to January 1, 1996, I had entered into one year leases with James Wayne. Each lease lasted for just one year, and
was not renewed." 

16. The original petition was the live pleading before the court prior to the filing of the counterclaim. The identical
language appears in paragraph seven of plaintiff's first amended original petition. 

 

17. The issue regarding Hybner's compliance with the garage leases was ultimately submitted to the jury for resolution. 
The court's charge to the jury requested a finding incorporating the language from the garage lease in paragraph seven
above, namely, "reasonable wear and tear and damage by fire only excepted." At trial, Hybner objected to the submission
of the issue not on the ground that it was not raised in the petition, as he urges here, but on the ground that the issue as
stated constituted an impermissible comment on the evidence. 

18. Indeed, at trial while testifying to the issue of attorney's fees, Hybner's counsel testified that his work involving both
the garage and the Valley Gold building was inextricably intertwined and could not be segregated.

19. Tex. Gov't Code Ann. §§62.105(1),(4)(Vernon 1998).

20. After a review of the juror Lundgren's testimony, we note that a question of fact was presented to the trial court as to
whether or not he was biased. Although juror Lundgren testified that his previous experience with Hybner might have
some effect upon his verdict in a close case, he testified he "would have to" rule in Wayne's favor if the evidence was
strong enough. This indicates a commitment to follow the law and not either party. Even if appellant had preserved error,
we would hold that the evidence was not conclusive as a matter of law and that the trial court did not abuse its discretion in
denying the challenge for cause. Compton v. Henrie, 364 S.W.2d 179,182 (Tex. 1963). The trial court was "in a better
position . . . to evaluate the juror's sincerity and his capacity for fairness and impartiality.". Goode v. Shoukfeh, 943 S.W.2d
441, 453 (Tex. 1997)(quoting Swap v. Shop, 365 S.W.2d 151, 154 (Tex. 1963)). 

21. While Hybner, the appellee, urged various objections to the question which were overruled, Wayne did not object.

22. This was number eighty-eight out of ninety-four entries. Earlier, Hybner testified that he repaired about thirty items on
the list because they were items he "should do."

23. This applies to the Wayne's remaining complaints as well.

24. He initially leased one-third of the building for six months at $900.00 per month.

25. He explained that Daniel Golden, who owned adjacent property, had been cleaning the lot because he used it. At the
time of trial, Wayne had sold the lot for approximately $40,000.00.

26. He helped Hybner install ten to twelve flourescent light fixtures. 

27. On one occasion, he helped Hybner clean the floor flooded because of the drain problem.